89 F.Supp.2d 1082 (2000)
Mary E. LEWIS, Petitioner,
v.
Quentin WILSON, Respondent.
No. 4:98CV-1610-SNL.
United States District Court, E.D. Missouri, Eastern Division.
March 29, 2000.
*1083 *1084 Robert Herman, Partner, Schwartz and Herman, St. Louis, MO, for Mary E. Lewis, plaintiff.
Erwin O. Switzer, III, Partner, M. Steven Brown, Attorney General of Missouri, Assistant Attorney General, St. Louis, MO, for Quentin Wilson, in his official capacity as Director of Revenue of the State of Missouri, defendant.

MEMORANDUM AND ORDER
LIMBAUGH, Senior District Judge.
This matter is before the Court on cross-motions for summary judgment by the parties. Petitioner seeks summary judgment that respondent, in his official capacity as Director of Revenue of the State of Missouri (petitioner or Director), violated her federal Constitutional rights by denying her application for a personalized "vanity" automobile license plate. Respondent seeks summary judgment that the First Amendment does not require the State of Missouri to issue the plate.

Summary Judgment Standard
Courts have repeatedly recognized that summary judgment, like dismissal, is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Assoc. Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir.1988). But there must be absolutely "no genuine issue as to a material fact and the moving party [must be] entitled to judgment as a matter of law." Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court will now turn to the factual history of the case.

Factual Background
In Missouri, all vehicles must be registered with the Department of Revenue (DOR). To legally operate a vehicle on the roads, the owner must obtain a valid Missouri license plate and attach it to the vehicle. Every year, the owner must renew her license plate with the DOR. In order to renew, the owner must present the DOR with proof of financial responsibility, an emission/safety inspection certificate and proof of insurance. Once these items are presented, the license plate is renewed for the next year. The standard Missouri license plate is a green, white and blue plate with a configuration of six characters: three numbers and three letters with a space in between the first three and last three characters.
In 1979, the Missouri State Legislature enacted Revised Missouri Statute Section 301.144 which created the personalized (vanity) license plate program in the state of Missouri. Under the vanity plate program, individual vehicle owners are permitted to choose for themselves, within the six character limit, any letter and number configuration for their license plates. The DOR charges an initial premium of $150.00 to obtain the vanity plate, and an additional $15.00 per year to renew it. The only limitations placed on the vehicle owner's free choice in purchasing a vanity plate are that the DOR may issue no duplicate plates, and that "[n]o personalized license plates shall be issued containing any letters, numbers or combination of letters and numbers which are obscene, profane, inflammatory or contrary to public policy." *1085 Mo.Rev.Stat. § 301.144.2 (West 1999). The vanity plate program generates roughly $2-3 million annually in revenue for the State of Missouri.
Apparently, the DOR has in place a multi-tiered procedure by which it reviews applications for vanity plates.[1] When the DOR receives an application, a clerk reviews it to determine whether the requested configuration is already taken or is on a list of impermissible configurations that have been denied in the past. This clerk also reviews the substance of the requested configuration, to determine whether the plate is "clearly and without question, obscene, profane, inflammatory or contrary to public policy." Affidavit of Teresa Tellman ¶ 13. If the clerk deems the configuration unacceptable for any of these reasons, she will then review any other configurations submitted by the applicant. If the applicant has submitted no other configurations, the clerk will return the application and fee with a letter explaining the reasons for denial. If other configurations are submitted, the clerk will review them in the same manner.
If the clerk approves the applicant's submitted configuration, she will then place that configuration on a list which is forwarded to a review committee. The review committee consists of Administrators of three bureaus within the DOR, including the Motor Vehicle Bureau, the Field Services Bureau, and the Alternative Funds Bureau. Each member of the review committee reviews the list of configurations, makes comments, and passes the list along to the next committee member. If the committee determines that a configuration is obscene, profane, inflammatory or contrary to public policy, it will inform the applicant that the requested configuration is denied. If the applicant has made a second choice, that configuration will go through the same review as the other plate. If the applicant made no second choice, the fee and application are returned. If the review committee finds that the requested configuration is not obscene, profane, inflammatory or contrary to public policy, the plate will be manufactured and issued to the applicant.
If the committee believes that the requested configuration is particularly problematic, the Director of the DOR may review the application along with a group known as the Motor Vehicle Policy Group. The Motor Vehicle Policy Group determines whether or not a plate should be issued with the requested configuration. If, after review with the Motor Vehicle Policy Group, the Director believes that the requested configuration is not obscene, profane, inflammatory or contrary to public policy and should be issued, a vanity plate bearing that configuration will be created and sent to the applicant. If the Director determines that the configuration should not be issued, the application will be denied.
From time to time, the DOR receives complaints regarding particular vanity plates that have been issued. When the DOR receives such a complaint, the General Counsel of the DOR reviews both the complaint and the configuration. The General Counsel then makes a decision as to whether or not to recall the plate because it violates the statute as being obscene, profane, inflammatory or contrary to public policy.
In June of 1986, the DOR issued petitioner a vanity plate bearing the words "ARYAN-1."[2] In September of that year, the DOR received a complaint about the plate. The DOR then sent petitioner a *1086 letter stating that it would not issue motor vehicle license plates if the letters or symbols thereon are obscene, profane or constitute fighting words. The letter further stated that the word "ARYAN" on petitioner's license plate constituted a fighting word, and directed petitioner to surrender the plate. Petitioner appealed that decision to the Administrative Hearing Commission.
Upon reaching the Administrative Hearing Commission, the DOR changed its position that the word "ARYAN" constituted a fighting word. Instead, the DOR relied on an argument that the plate violated a state regulation that no plate would be issued which was profane, obscene, inflammatory or patently offensive or otherwise conflicting with an overriding public policy. Mo.Code Regs.Ann. tit. 12, § 10-23.100(6) (1986). The DOR took the position that the world "ARYAN" had been utilized by Adolf Hitler and the German Nazis during World War II to describe a so-called "master race," and to justify the extermination of a frighteningly large percentage of the world's Jewish population. For that reason, the DOR argued, the word conflicted with an overriding public policy. The Administrative Hearing Commission sustained the decision of the DOR, relying on Mo.Code Regs.Ann. tit. 12, § 10-23.100(6) (1986).
Petitioner then appealed that decision to the Missouri Court of Appeals, where she argued that the scope of the regulation was broader than permitted under the enabling statute. At that time, Mo.Rev.Stat. § 301.144 (West 1986) stated the following:
The director of revenue shall issue rules and regulations establishing the procedure for application for and issuance of the special personalized license plates and shall provide a deadline each year for the applications.... No two owners shall be issued identical plates and no plates shall be issued containing any profane or obscene word.
The Missouri Court of Appeals agreed with petitioner that the language of Section 301.144 was not broad enough to support a regulation which banned certain slogans from license plates because they were contrary to overriding public policy. The court ordered that the case be remanded to the Administrative Hearing Commission with directions to order the DOR to rescind its decision to revoke petitioner's license plate. See Carr v. Director of Revenue, 799 S.W.2d 124, 126 (Mo.Ct. App.1990).
In response to the Carr decision, the Missouri State Legislature amended the language of Section 301.144 to its current status. That is, "[n]o personalized license plates shall be issued containing any letters, numbers or combination of letters and numbers which are obscene, profane, inflammatory or contrary to public policy." Mo.Rev.Stat. § 301.144.2 (West 1999) (Section 301.144.2). However, since 1992, petitioner has been in possession of the controversial "ARYAN-1" plate. In 1997, the DOR received an anonymous complaint letter from a person who had seen petitioner's plate and been offended. As a result, on June 3, 1997, Jannette Lohman, respondent's predecessor as Director of the DOR, reviewed the plate with the members of the Motor Vehicle Policy Group. Lohman herself found the slogan offensive, and the Motor Vehicle Policy Group agreed with her that the general public would also find the plate objectionable.
On June 17, 1997, the DOR advised petitioner by letter that her "ARYAN-1" license plate would not be renewed because it conveyed a message that is "contrary to public policy."[3] In reaching this decision, *1087 the DOR relied on Section 301.144.2. Petitioner now challenges the constitutional validity of that statute, arguing that it creates standardless discretion in the Director, who may accept or reject applications for vanity plates based not on clearly defined legal standards but rather on the basis of ad hoc determinations of what constitutes "public policy." Although it appears from the briefs that minor issues of fact may still exist in this case, the Court determined that those issues were not substantial or material, and thus removed the case from the trial docket and took it on the cross-motions for summary judgment.

Discussion
The First Amendment guarantees freedom of speech. However, it does not grant carte blanche for all speech under all circumstances. See Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). Rather, a governmental entity may "preserve the property under its control for the use to which it is lawfully dedicated." Id., 473 U.S. at 800, 105 S.Ct. at 3448. In determining whether governmental regulation of putative speech is permissible, the Court must undertake three discrete steps. First, the Court must determine whether the subject of the analysis is speech at all. Second, the Court must determine the nature of the governmentally created forum. Finally, the Court must assess whether the regulation satisfies the requisite standard. Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446.

A. Speech
In this case, the parties seem to agree that speech, or at least expressive conduct giving rise to some level of First Amendment scrutiny, is present.[4] The Court believes this conclusion to be inescapable. In order to find speech, "there must exist both an intent to convey a particularized message and a great likelihood that this message will be understood." Missouri ex rel. Missouri Highway & Transp. Comm'n v. Cuffley, 927 F.Supp. 1248, 1254 (E.D.Mo.1996), rev'd on other grounds, 112 F.3d 1332 (8th Cir. 1997) (Cuffley I). The Court must look to the nature of the activity in conjunction with the factual context and environment in which it is undertaken. Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974).
Here, the purpose claimed by the DOR for maintaining the vanity plate program (i.e. to raise revenue and provide identification for vehicles) could certainly be maintained by the traditional manner of licensing automobiles. However, the State of Missouri has intentionally created an opportunity for individuals to identify their vehicles through a particularized message. It seems doubtful that this program would generate the substantial revenue that it does if purchasers of vanity plates did not believe there to be a great likelihood that their messages would be understood. These messages are literally conveyed throughout the state upon the vehicles which they identify. Therefore, it appears that the parties are correct in assuming that speech is involved and First Amendment protection is triggered here.

B. Forum
Having determined that speech is involved in this case, the Court must next determine the nature of the speech forum created by the government. Courts have traditionally recognized three types of fora. The first and oldest type of forum is the "traditional public forum," such as a park, street corner or town square which "by long tradition or by government fiat *1088 ha[s] been devoted to assembly and debate." Perry Educ. Ass'n v. Perry. Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The second type of governmental forum is the "designated public forum," a location or channel of communication designated by the government for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. Perry, 460 U.S. at 45-46, 103 S.Ct. at 955. The third type of governmental forum, the "nonpublic forum," is defined by what it is not. Any forum which is not by tradition or designation a forum for public communication is a nonpublic forum. Perry, 460 U.S. at 46, 103 S.Ct. at 955.
The significance of the classification of the forum lies in the level of scrutiny the Court applies to the regulation of each different type. If the Court determines that the vanity plate program establishes a traditional public forum, then the Court will apply strict scrutiny. That is, any regulation of speech must be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. United States Postal Serv. v. Council of Greensburg Civic Ass'ns, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686-87, 69 L.Ed.2d 517 (1981). If the Court determines that the program establishes a limited or designated public forum, then the Court will apply intermediate scrutiny. Any regulation must further a compelling government interest in a way that is tailored similarly narrowly as in a traditional public forum. See Widmar v. Vincent, 454 U.S. 263, 269-70, 102 S.Ct. 269, 274-75, 70 L.Ed.2d 440 (1981). Finally, if the Court determines that the program creates a nonpublic forum, then the scrutiny will be limited to rationality and viewpoint neutrality. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448. That is, the government may regulate the program by any reasonable and viewpoint neutral means.
Respondent argues that this case actually falls into a fourth categoryno forum at allciting Arkansas Educational Television Commission v. Forbes, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Forbes involved an attempt by a third-party candidate to participate in a political debate sponsored by an Arkansas public television broadcaster. The Supreme Court explained that, as a general rule, because of the scarcity of the broadcast medium, and the importance of editorial control of that medium, broadcasting is not appropriate for scrutiny under the forum doctrine. See Forbes, 523 U.S. at ___, 118 S.Ct. at 1640. However, the Supreme Court determined that the debate itself constituted a nonpublic forum, and that because of the vital importance of debates to the political process, this should be recognized as an exception to the rule against applying forum doctrine in the public broadcasting context. Id., 523 U.S. at ___, 118 S.Ct. at 1643. The Supreme Court found that the broadcaster had put forth a reasonable and viewpoint neutral reason for excluding Forbes from the debate. Forbes had practically no popular support, and his inclusion in the debate would have reduced the already limited amount of time available for the viable candidates to express their positions. Therefore, the Court found the broadcaster's exclusion of Forbes from the nonpublic forum (i.e. the debate) to have been a reasonable and viewpoint neutral exercise of regulation.
The Eighth Circuit Court of Appeals recently applied Forbes in a case arising in this district. In Knights of the Ku Klux Klan v. Curators of the University of Missouri, 203 F.3d 1085 (8th Cir.2000), the Eighth Circuit addressed the question of whether or not a public radio broadcaster could exclude a group that wished to underwrite a segment of the National Public Radio news-show All Things Considered. The district court found no justification for applying the Forbes exception to the rule against utilizing forum analysis in broadcasting cases. See Knights of the Ku Klux Klan v. Bennett, 29 F.Supp.2d 576, 583 (E.D.Mo.1998). Therefore, the district court concluded that the enhanced underwriting *1089 program maintained by the broadcaster to raise funds for its operations was not a forum. The Court of Appeals affirmed that decision, finding that the underwriting acknowledgments at issue in the case constituted governmental speech subject to the broadcaster's editorial control.
The Court does not believe that either Forbes or Knights of the Ku Klux Klan v. Curators of the University of Missouri applies in this case. This case does not involve broadcasting, or any element of editorial control. The only natural or inherent constraint upon the message selected by a purchaser of a vanity plate is that it be six characters or less in length. That constraint calls for no editorial discretion by the Director whatsoever. Either the message fits on the plate or it does not. Therefore, this case is not subject to the Supreme Court's and the Eighth Circuit's admonitions that the "public forum doctrine should not be extended in a mechanical way to the very different context of public ... broadcasting." Curators, 203 F.3d 1085, 1092 quoting Forbes, 118 S.Ct. at 1639. This case does not involve broadcasting of any sort. Rather, the Court here is stuck with the forum analysis.[5]
This Court does not believe that the vanity plate program establishes either a traditional or designated public forum. A license plate is certainly not analogous to a park or street corner, nor is it analogous to a school auditorium which might be made available to certain speakers. Vanity license plates involve only the most limited and superficial degree of discourse. However, by allowing drivers to put some individualized message out there, the government is creating an opportunity for expression not otherwise available. Therefore, by process of elimination, the Court concludes that this case involves a nonpublic forum, and will apply rationality review.

C. First Amendment Scrutiny
The Court must now determine whether respondent's revocation of petitioner's vanity plate was a reasonable and viewpoint neutral government action. Petitioner argues both that respondent's application of Section 301.144.2 to her license plate is unconstitutional viewpoint discrimination, and that the statue is unconstitutional on its face because it grants limitless discretion to the Director in deciding which proposed license plates violate public policy and which do not. Respondent argues that Section 301.144.2 is a reasonable time, manner and place regulation, necessary to maintain safety on the roadways of Missouri. Respondent further argues that the decision to revoke petitioner's plate was not so subjective as to be arbitrary. Instead, the decision was reviewed at several levels within the DOR and was based on knowledge, experience and common sense. Finally, respondent argues that if the Court orders it to issue a license plate which says "ARYAN-1," there may be no limits on what else may be issued.[6]
In the first place, the Court believes respondent's argument that Section 301.144.2 is a reasonable and viewpoint neutral safety regulation reveals the problem with the "public policy" language in Section 301.144.2. Before the Administrative Hearing Commission, respondent argued that the term "ARYAN-1" was against public policy because it advocated the superiority of one race over others. See Exhibit 2 to Petitioner's First Amended Complaint. However, in briefing the matter for this Court, respondent dropped the argument that the term itself was against public policy in favor of an argument that the potential inflammatory effects of the license plate were against public policy. Respondent might have simply *1090 relied upon the "inflammatory" prong of Section 301.144.2 in the first place, but instead he changed his argument. This was possible only because the public policy language of the statute is too broad. Furthermore, respondent's change in strategy appears to the Court to have been an attempt to take the case out of the viewpoint discrimination context by arguing that respondent is not targeting petitioner's beliefs.[7] Because the meaning of the phrase "contrary to public policy," is so nebulous and malleable, respondent can argue that it means anything presently politically expedient. A governmental entity may not avoid a claim of viewpoint discrimination simply by drafting legislation so broad or vague as to apply to anything convenient.
The Court similarly rejects respondent's argument that constitutional vagueness doctrine does not apply in this case because Section 301.144.2 involves no threat of criminal sanction. See Hynes v. Mayor and Council of the Borough of Oradell, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976). In finding the public policy language of Section 301.144.2 unreasonable, the Court is not applying a void for vagueness or facial invalidity analysis. Rather, the Court finds the "public policy" provision of 301.144.2 to be an unreasonably vague regulation of a nonpublic forum, which in effect creates standardless discretion in a government official. In doing so, the Court recognizes the standards for vagueness applied in other constitutional contexts. In order to be constitutionally specific, a statute must provide standards for those who enforce its provisions. See Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The "public policy" provision in Mo.Rev.Stat. § 301.144.2 relied upon by the Director here does not.
The Court appreciates the DOR's concern for public safety. Such a concern is certainly legitimate, and the policy concerning safety on Missouri's roadways should be furthered. However, reasonableness of regulation must be determined in the context of the purpose which the forum at issue serves. Perry, 460 U.S. at 49, 103 S.Ct. at 957. Section 301.144.2 serves the purpose of raising funds for the State of Missouri and allowing motorists to identify their vehicles in a particularized manner which they choose. Although Captain Billy Nelson, a veteran officer of the Missouri Highway Patrol, testified that a driver averting his or her eyes from the roadway for even a few seconds creates a heightened danger on the highways, the same could be said for any vanity plate which prompts another driver to read it.[8] And road rage or acts of vehicular aggression are presumably already punishable under other Missouri laws. Therefore, the respondent cannot reasonably rely upon this prior restraint to protect the public from otherwise illegal acts of retribution. See Cohen v. California, 403 U.S. 15, 23, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971). In enforcing the unreasonably broad and vague "public policy" provision of Section 301.144.2, respondent violated petitioner's constitutional right to free speech. Therefore, the Court will grant petitioner's prayer for declaratory relief.

D. Other Remedies
Having determined that petitioner's rights were violated, the Court must now address the issue of whether petitioner is entitled to the relief she seeks other than *1091 declaratory relief. The Court will first address petitioner's prayer for injunctive relief. Petitioner seeks an injunction against respondent in the form of a writ of prohibition, requiring respondent to issue the requested vanity plates. As the Court pointed out above, petitioner only challenged the "public policy" provision of Section 301.144.2, and thus that was the only prong of the statute the Court analyzed.
Missouri law provides for the severability of all remaining constitutionally sound provisions of a statute part of which has been declared unconstitutional. See Mo.Rev.Stat. § 1.140 (West 1969). The Court may uphold the remainder of the statute if it "is in all respects complete and susceptible of constitutional enforcement" and the Court concludes that it would have been adopted even if it had been known that the "excluded portion was invalid." Millsap v. Quinn, 785 S.W.2d 82, 85 (Mo.1990) (en banc). Here, it appears that Section 301.144.2 is complete without the "contrary to public policy" language. The Court may presume that the legislature would have passed the statute without that language, because the legislature did so, only adopting the unconstitutional language in 1992. Therefore, because the Director might still have constitutionally permissible grounds for denying or revoking petitioner's vanity plate, the Court will deny petitioner's prayer for injunctive relief.
Finally, the Court will turn to petitioner's prayer for attorney's fees pursuant to 42 U.S.C. § 1988 (Section 1988). Section 1988 provides for an award of "reasonable attorney's fees as part of the costs" to the "prevailing party" in an action to enforce 42 U.S.C. § 1983. "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of [her] claim." Farrar v. Hobby, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The "moral satisfaction" of a declaration such as that obtained by petitioner is not sufficient to confer prevailing party status on a plaintiff. See Hewitt v. Helms, 482 U.S. 755, 762-63, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). As petitioner failed to obtain the injunction she sought, the Court cannot find her to be a prevailing party. Accordingly, petitioner's prayer for attorney's fees will be denied.

Conclusion
The "contrary to public policy" language in Section 301.144.2 is an unreasonable restriction on free speech. It lacks sufficient specificity to provide the government officials charged with applying it any guidance. Instead, those officials are left with the discretion to make ad hoc determinations based on subjective and undefined principles which could change from one day to the next. Furthermore, the challenged language is designed to target particular viewpointsthose which are contrary to public policy. The unconstitutional language is not saved by the fact that it was drafted broadly enough so that the targeted viewpoint might not always be the same one. The First Amendment does not allow the state legislature to imbue certain officials with the authority to make subjective determinations of which viewpoints comport with public policy and which do not. However, the Court need not throw out the baby with the bath water. The unconstitutional language may be excised from the statute without rendering the rest of it meaningless. Therefore, there may still be constitutional grounds for the Director to take the action challenged in this case. The Court will not enjoin the Director from taking that action before it has the opportunity to do so constitutionally.

ORDER
IT IS HEREBY ORDERED that Petitioner's Motion for Summary Judgment (# 34) is GRANTED in part and DENIED in part.
IT IS FURTHER ORDERED that Respondent's Motion for Summary Judgment (# 26) DENIED.
IT IS FURTHER ORDERED that declaratory judgment is entered for petitioner *1092 that respondent violated her constitutional rights by revoking her vanity plates under the "public policy" prong of Mo.Rev. Stat. § 301.144.2.
IT IS FURTHER ORDERED that petitioner's prayer for injunctive relief is DENIED.
IT IS FURTHER ORDERED that each side shall bear its own costs and fees in this matter.
IT IS FINALLY ORDERED that, as the Court's action of this date completely disposes of all issues in this matter, the matter is DISMISSED.
NOTES
[1] In describing this procedure in his Statement of Uncontroverted Facts, the respondent failed to cite a single regulation governing this review system. Rather, respondent repeatedly cited to paragraphs ten through twenty-four of the affidavit of Teresa Tellman, Assistant Administrator of the Motor Vehicle Bureau of the Missouri Department of Revenue.
[2] The Court's recitation of the procedural history of prior litigation between these parties related to the substance of this matter will be largely paraphrased from the opinion of the Missouri Court of Appeals in Carr v. Director of Revenue, 799 S.W.2d 124, 125 (Mo.Ct.App. 1990).
[3] Interestingly, respondent now appears to argue not that the slogan "ARYAN-1" itself espouses a viewpoint that is contrary to public policy, but rather that the words may incite other drivers on the highway to commit acts of retribution or so-called "road rage," which in turn violates public policy. It seems to the Court that such an argument might relate more closely to the "inflammatory" prong of Mo.Rev.Stat, § 301.144.2. However, respondent limits his argument to the "public policy" prong, and the Court will therefore limit its review to that portion of the statute.
[4] Respondent does make the argument at one point in his Memorandum of Law in Support of His Motion for Summary Judgment that the vanity plate program does not constitute a medium of expression at all. In support of his argument that no speech is involved, respondent cites Kahn v. Dep't of Motor Vehicles, 16 Cal.App.4th 159, 20 Cal.Rptr.2d 6 (1993). In spite of this argument, respondent concedes that there is enough expression present here to trigger some form of First Amendment analysis.
[5] The Court is encouraged by the fact that at least two other federal district courts have previously addressed license plate cases using the public forum analysis. See Sons of Confederate Veterans, Inc. v. Glendening, 954 F.Supp. 1099 (D.Md.1997); Pruitt v. Wilder, 840 F.Supp. 414 (E.D.Va.1994).
[6] The DOR suggests such offensive hypotheticals as "KIL-BLK," and "KIL-JEW."
[7] Although the Court makes no ruling on the constitutionality of any prong of Section 311.144.2 other than the "public policy" provision, it would appear to the Court that the highly offensive hypothetical vanity plates proposed by the DOR in its brief could easily and permissibly be denied as "fighting words" under the inflammatory prong of the statute.
[8] In ruling on this summary judgment motion, the Court makes no finding of fact regarding whether or not there is a likelihood that petitioner's "ARYAN-1" license plate would increase the risk of harm on Missouri's roadways. However, the Court does note that it is undisputed that plaintiff carried the plate on her vehicle without incident for a number of years.